**PITTS & COLLARD, L.L.P. and Gary Pitts, Appellants,**

v.

**Arthur L. SCHECHTER, Arthur L. Schechter, P.C. d/b/a Schechter & Associates, Schechter & Marshall, L.L.P., and Schechter, McElwee & Shaffer, L.L.P., Appellees.**

**and**

**Arthur L. Schechter, Arthur L. Schechter, P.C. d/b/a Schechter & Associates, Schechter & Marshall, L.L.P., and Schechter, McElwee & Shaffer, L.L.P., Appellants,**

v.

**Pitts & Collard, L.L.P. and Gary Pitts, Appellees.**

**No. 01–08–00969–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 29, 2011.

David T. Moran, Charles L. Babcock, Jackson Walker L.L.P., Houston, TX, Lori J. Lamoreaux, Jackson Walker L.L.P., Dallas, TX, Steven Wayne Smith, Austin, TX, for Appellant.

Dale Jefferson, Levon G. Hovnatanian, Bruce E. Ramage, Raul H. Suazo, Martin, Disiere, Jefferson & Wisdom, L.L.P., Houston, TX, for Appellee.

Lori J. Lamoreaux, for Appellant.

Panel consists of Chief Justice RADACK and Justices MASSENGALE and NUCHIA.*

**OPINION ON REHEARING** \*\*

MICHAEL MASSENGALE, Justice.

Gary Pitts and Pitts & Collard, LLP sued Arthur L. Schechter, Arthur L. Schechter, P.C. d/b/a Schechter & Associates, Schechter & Marshall, L.L.P., and Schechter, McElwee & Shaffer, L.L.P. for breach of contract. The contract claim was based upon an allegation that the Schechter parties failed to pay referral fees from nearly a thousand lawsuits that Pitts referred by way of nine letter agreements.[1] Pitts also sued the Schechter parties for breach of a subsequent 1995 agreement, which also pertained to fees and expenses from certain referred cases.

Schechter raised several affirmative defenses, countersued for breach of contract based on the nine letter agreements, and sued for defamation and abuse of process. He alleged that as retribution for the dispute over referral fees, Pitts made slanderous statements to the Houston City

---

\* The Honorable Sam Nuchia, Senior Justice, Court of Appeals for the First District of Texas, sitting by assignment.

\*\* Appellants and cross-appellees Gary Pitts and Pitts & Collard, LLP have filed a motion for rehearing of our original opinion. Appellees and cross-appellants Arthur L. Schechter, Arthur L. Schechter, P.C. d/b/a Schechter & Associates, Schechter & Marshall, L.L.P., and Schechter, McElwee & Shaffer, L.L.P. also filed a motion for rehearing. We deny Pitts's motion and grant Schechter's motion. We withdraw our opinion and judgment of May

12, 2011, and we issue this opinion and judgment in their place.

1. Pitts & Collard's interest in this case was assigned to Pitts because the firm closed its business except to wind up these pending cases, and Collard settled with Schechter on his own behalf and on behalf of his one-half interest in the partnership. For simplicity, some references to "Pitts" in this opinion denote both the individual and the partnership. Similarly, because of the unity of interests, Schechter's law firms may be referred to as "the Schechter parties" or "Schechter."

Council before approval of his nomination to serve as the Chairman of the Metropolitan Transit Authority of Harris County. Schechter also alleged that Pitts slandered him to professional colleagues, interfered with his client relationships by sending letters informing the clients they were being charged interest on their litigation expenses and informing them how to file a grievance, and abused the litigation process by failing to file certain exhibits under seal as the trial court had ordered. Both parties raised various affirmative defenses, and the case was tried to a jury.

After considering the jury's verdict, numerous post-trial motions, and the applicable law as provided by the parties, the trial court entered judgment as follows:

- take-nothing judgment against Pitts on the breach-of-contract claim pertaining to the nine letter agreements, based on the jury's answers to questions about Pitts's prior breach, prior repudiation, and the commercial impracticability of the agreements;
- judgment for the Schechter parties, including attorney's fees, on their breach-of-contract claim pertaining to the letter agreements;
- judgment for Pitts on the breach-of-contract claim pertaining to the 1995 contract;
- take-nothing judgment against Schechter on his claims pertaining to Pitts's communication with the clients;
- judgment for Schechter for compensatory and punitive damages on the abuse-of-process claim;
- judgment for Schechter for compensatory and punitive damages on the defamation claim that alleged Pitts slandered him to his colleagues; and
- judgment not withstanding the verdict in favor of Pitts on Schechter's defamation claim relating to statements made before the Houston City Council

because these claims were barred by limitations.

Both Pitts and Schechter filed notices of appeal addressing both the contract and tort parts of the underlying case. We affirm the trial court's judgment pertaining to the contract claims and the non-economic and exemplary damages awarded under Schechter's professional colleague defamation cause of action. We reverse and render judgment that Schechter take nothing by way of economic damages for his professional colleague defamation cause of action, and we reverse and render a take-nothing judgment on Schechter's abuse of process cause of action.

## I. Background

In the early 1990s, attorney Gary Pitts and his law partner, Ed Collard, advertised about the product liabilities associated with silicone breast implants. As a result of their advertising campaign, over a thousand women retained Pitts & Collard to pursue possible claims. The major manufacturers of silicone breast implants announced a global settlement in September 1993, after negotiations with a plaintiffs' steering committee in a federal lawsuit filed in Alabama. Any woman with silicone breast implants could opt into this settlement. One feature of this settlement was that an opt-in claimant's attorney's contingency fee would be reduced to 25%. The settlement was approved by the federal district court in early 1994.

From late 1993 through 1994, in a series of nine letter agreements, Pitts & Collard referred approximately 1,000 clients to the law firm of attorney Arthur L. Schechter. Each such agreement referred to the lawyers' prior agreements and course of dealing, which included a 60/40 split of attorney's fees on a fees-recovered basis, with the larger amount going to Schechter's firm and the balance to Pitts & Collard.

After the second such letter agreement was signed, the lawyers jointly sent a letter to their clients stating that they would share the work and share the fee received from their cases. The client letter indicated that Richard Melancon, an attorney associated at that time with Schechter, would have day-to-day responsibility for their cases.

Initially, the lawyers thought this would be a lucrative arrangement because of the global settlement. But in the summer of 1995, one of the largest manufacturers of silicone breast implants, Dow Corning, sought bankruptcy protection. The global settlement was revised to apply only to claims against the other major implant manufacturers. The lawyers continued to advocate actively for the clients in cases that did not involve Dow Corning.

A dispute arose in 1995, and Pitts sued Schechter, alleging that the cases were being mismanaged. That lawsuit settled after mediation. As part of the settlement, the parties referred almost 400 of the breast-implant cases to attorney Richard Laminack. However, Laminack refused to take any cases against Dow Corning.

Schechter argues that Pitts stopped working on the cases in 1996, although Schechter continued to represent the clients and pay Pitts referral fees until late 1997. The revised global settlement ended in 1999. At that time, only the Dow Corning cases remained from the cases referred by Pitts to Schechter. But the Dow Corning bankruptcy court had dramatically reduced the fees recoverable by claimants' attorneys, and in some types of cases, the federal court had disallowed attorney's fees entirely. This resulted in a financial loss to the attorneys, particularly Schechter, who had fronted expenses in the cases. In 2001, Pitts sought arbitration under the 1995 settlement agreement, alleging that Schechter was not properly sharing fees. In March 2002, the parties arbitrated the dispute, which was resolved in Schechter's favor.

Meanwhile, by April 2002, Schechter had been appointed to the board of directors of the Metropolitan Transit Authority of Harris County, and he was under consideration to become the chairman. On April 2, 2002, approximately two weeks after the arbitration, Pitts spoke at a public meeting of the Houston City Council, insinuating that Schechter was difficult, dishonest, and unethical in the conduct of his business and political affairs. These comments were recorded and broadcast through local-access cable television. Pitts implored the city council to investigate Schechter and to begin by speaking to his former colleagues and law partners. Pitts also spoke to some of Schechter's former associates and partners about his appointment to the METRO board and the consideration of him for its chairmanship. He told Melancon and other former colleagues of Schechter that someone from city council might contact them to discuss their private opinions about Schechter.

Pitts became aware in 2004 that Schechter had begun charging the clients interest on the expenses paid on the contingent-fee cases. Pitts informed the clients that this practice was not part of their contingent-fee arrangement. He also told them how to file a grievance with the State Bar. Subsequently, Schechter stopped charging the clients interest.

Pitts sued Schechter in 2005 for breach of contract and other claims, alleging that Schechter owed him attorney's fees from the nine letter agreements. Pitts generally contended that he was entitled to share in the attorney's fees recovered, and that Schechter was not entitled to an offset for losses in those cases resulting only in a loss. Schechter took the opposite position,

arguing that the losses in some cases should be offset against the attorney's fees collected in other cases. Schechter also countersued for breach of contract, alleging that Pitts did not share the litigation work and that Schechter had to hire other people to do the work. Finally, Schechter sued for defamation related to the comments that Pitts made before city council in 2002 and repeated to Schechter's professional colleagues. During the course of litigation, Pitts repeatedly filed a recording of the statements he made before city council, but he did not file them under seal as required by a protective order entered by the trial court at the agreement and request of the parties. As a result, Schechter added a claim for abuse of process.

## II. Claims arising from joint representation

Both parties appeal from various aspects of the judgment relating to disputes over their joint representation of the breast-implant clients. Pitts challenges the judgment against him for breach of contract. Schechter challenges the rejection of some of his contract claims on limitations grounds as well as the rejection of his claim that the parties had a joint venture which gave rise to a duty of good faith and fair dealing that was allegedly breached by

Pitts. Both parties raise issues relating to attorney's fees.

### A. Pitts's appeal concerning the nine letter agreements

The jury found that Pitts was first to breach the nine letter agreements and that Schechter's breach was excused by Pitts's repudiation and by commercial impracticability. The trial court entered judgment on the jury's verdict in Schechter's favor. Pitts raises numerous appellate issues pertaining to his contract claim, arguing that the trial court erred in failing to render judgment in his favor. He disputes the legal and factual sufficiency of the evidence supporting three affirmative defenses asserted by Schechter: prior breach, prior repudiation, and commercial impracticability. He also asserts that the trial court should not have set aside the jury's finding that Schechter failed to pay fees because Schechter elected to continue the contract and thereby waived his opportunity to have his obligations discharged.

#### 1. Prior breach by Pitts

 Pitts argues that there was no evidence, or legally and factually insufficient evidence, to support the jury's verdict that he was first to breach the nine letter agreements by not sharing the litigation work. In a legal sufficiency, or "no-evidence" review,[2] we determine whether

---

**2.** Schechter contends that the issue of legal sufficiency of the evidence was not preserved. To preserve a complaint for appellate review, a party must first demonstrate that the complaint was made to the trial court by a timely request, objection, or motion. TEX.R.APP. P. 33.1. A "no-evidence" issue is raised in the trial court and preserved for appellate review in one of five ways: (1) a motion for instructed verdict, (2) a motion for judgment n.o.v., (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex.

1992); *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991); *El–Khoury v. Kheir*, 241 S.W.3d 82, 86 (Tex.App.-Houston [1st Dist.] 2007, pet. denied). Pitts filed five motions for judgment n.o.v., in which he argued that there was no evidence or jury finding that he breached the nine letter agreements, that there was no evidence that the alleged breach was material, and that Schechter waived the excuse of prior repudiation by not promptly suing Pitts and instead waiting for Pitts's performance under the contract. In addition, Pitts argued at length in his initial motion for judgment n.o.v. that the nine letter agreements were an integrated contract and were

the evidence would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight accorded to their testimony. *Id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

■■■ In a factual-sufficiency review,[3] the court must examine both the evidence supporting and contrary to the judgment. *See Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001); *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex. 1989). In reviewing a factual-sufficiency

challenge to a jury finding on an issue on which the party did not have the burden of proof, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 275 (Tex. App.-Amarillo 1988, writ denied). The fact-finder is the sole judge of the witnesses' credibility and the weight to be given their testimony, and the fact-finder may choose to believe one witness over another. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003). Because it is the fact-finder's province to resolve conflicting evidence, we must assume that the fact-finder resolved all evidentiary conflicts in accordance with its decision if a reasonable person could have done so. *See id.* An appellate court may not impose its own opinion to the contrary of the fact-finder's implicit credibility determinations. *Id.*

### a. Ambiguity of agreements

■■■ Pitts's legal argument that he had no obligation to share the litigation work relies upon the text of the nine letter agreements, which he contends was unam-

not ambiguous, therefore the jury should not have been permitted to consider parol evidence in determining whether Pitts breached the contract and whether his breach preceded Schechter's contractual breach. Pitts also filed a motion for new trial, in which he argued, among other things, that the evidence was legally and factually insufficient to support the jury's answers on these issues. Pitts's motions for judgment n.o.v. and his motion for new trial were sufficient to inform the trial court of the complaints he now raises on appeal, i.e., that there was no evidence to support Schechter's affirmative defenses and that he did not breach the nine letter agreements because they unambiguously do not require him to share the work. Thus, we

conclude that these issues are preserved for our review.

3. In his motion for new trial, as on appeal, Pitts argued that the evidence was factually insufficient to support the jury's finding as to Schechter's affirmative defenses. The standard of review of the denial of a motion for new trial is abuse of discretion. *Champion Int'l Corp. v. Twelfth Court of Appeals,* 762 S.W.2d 898, 899 (Tex.1988) (orig. proceeding). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

biguous in that regard. "When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent." *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994); *see Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.,* 325 S.W.3d 692, 695 (Tex.App.-Houston [1st Dist.] 2010, pet. denied). Whether a contract is ambiguous is a question of law, which we review de novo. *See Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983); *Tellepsen Builders,* 325 S.W.3d at 696.

 A contract is not ambiguous if its wording permits a definite or certain legal meaning. *DeWitt Cnty. Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex.1999); *Nat'l Union Fire Ins. Co. v. CBI Indus.,* 907 S.W.2d 517, 520 (Tex.1995). A contract is ambiguous if, after applying established rules of construction, its meaning is uncertain and doubtful or the writing is reasonably susceptible to more than one meaning. *DeWitt Cnty. Elec. Coop.,* 1 S.W.3d at 100; *Coker,* 650 S.W.2d at 393. In determining whether a contract is ambiguous, courts construe and harmonize all provisions of the contract to discern the parties' intent. *Coker,* 650 S.W.2d at 393–94; *Tellepsen Builders,* 325 S.W.3d at 695. This inquiry also considers the context of the agreement of the parties and the circumstances present when the agreement arose. *Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 282 (Tex.1996). To discern the contracting parties' intent, courts may properly consider all writings pertaining to the same transaction, even if the writings were executed at different times and do not expressly refer to one another. *DeWitt Cnty. Elec. Coop.,* 1 S.W.3d at 102; *see also Miles v. Martin,* 159 Tex. 336, 341, 321 S.W.2d 62, 65 (1959) ("It is well settled that separate instruments executed at the same time, between the same parties, and relating to the same subject matter may be considered together and construed as one contract. This undoubtedly is sound in principle when the several instruments are truly parts of the same transaction and together form one entire agreement." (citation omitted)).

 A writing is not ambiguous merely because it lacks clarity or because a disagreement in interpretation arises. *DeWitt Cnty. Elec. Coop.,* 1 S.W.3d at 100; *Tellepsen Builders,* 325 S.W.3d at 696. "The parties' interpretation of a contract is parol evidence, and parol evidence is not admissible to create an ambiguity." *Zurich Am. Ins. Co. v. Hunt Petroleum (AEC), Inc.,* 157 S.W.3d 462, 465 (Tex. App.-Houston [14th Dist.] 2004, no pet.) (citing *Friendswood Dev. Co.,* 926 S.W.2d at 283). Likewise, parol evidence of the parties' intent is not admissible to vary the terms of an otherwise unambiguous instrument. *See Estes v. Rep. Nat'l Bank,* 462 S.W.2d 273, 275 (Tex.1970). For parol evidence of the parties' intent to be admissible, the contract must first be ambiguous as a matter of law. *See id.*

On appeal, as in the trial court, Pitts argues that the jury should have been restricted to considering only the written language in the nine letter agreements. The charge asked the jury to determine if either Arthur L. Schechter, P.C. or Pitts & Collard, L.L.P. failed to comply with the nine letter agreements. The jury was instructed that it could consider parol evidence. All the letter agreements were substantially the same, and provided as follows:

1. November 5, 1993. "This letter will confirm that we are referring the attached one hundred (100) cases to be handled by Richard Melancon, Esq. of your law firm on our usual 60%/40% split of attorney's-fees-recovered basis, with the larger amount to your firm, and the balance to our firm.... We would

also like to be copied in on significant pleadings and correspondence and have the option of attending the trial of any of these cases in a 'second chair' status. Our referral of these cases and this agreement are irrevocable, and we appreciate your firm's assistance in this matter.... Again, we thank you for your involvement and look forward to working with you on these cases and additional cases in the future."

2. December 31, 1993. "This letter will confirm that we are referring the attached five hundred seventy-one cases to Richard Melancon, Esq. of your law firm on our usual 60%/40% split of attorney's-fees-recovered basis, with the larger amount to your firm, and the balance to our firm.... Our referral of these cases and this agreement are irrevocable, and we appreciate your firm's assistance in this matter.... Again, we thank you for your involvement and look forward to working with you on these cases and additional cases in the future."

3. March 10, 1994. The letter retracted 13 files that were mistakenly referred and referred an additional 298 cases "on the same 60%–40% referral basis as set out in our December 31, 1993, letter regarding the previous 571 cases." It concluded, "We look forward to working with you on these cases and on other matters in the future."

4. March 26, 1994. This letter referred an additional 114 cases, again referred to the letter of December 31, 1993, and stated: "We look forward to working with you on these cases and on other matters in the future."

5. May 5, 1994. This letter referred an additional 17 cases, again referred to the letter of December 31, 1993, and stated: "We look forward to working with you on these cases and on other matters in the future."

6. May 19, 1994. This letter referred an additional 21 cases, again referred to the letter of December 31, 1993, and stated: "We look forward to working with you on these cases and on other matters in the future."

7. June 10, 1994. This letter referred an additional 9 cases, referred to the letter of December 31, 1993, and stated: "Thank you for your attention and assistance in these and other matters."

8. August 19, 1994. This letter referred 3 cases and referred to the December 31, 1993 letter. It concluded, "Thank you for your attention and cooperation in these and other matters."

9. September 9, 1994. This letter referred one case and referred to the December 31, 1993 letter. It concluded, "Thank you for your attention and cooperation in these and other matters."

On January 31 1994, Pitts and Melancon sent a joint letter, on Pitts & Collard, L.L.P. letterhead, to the clients whose cases had been referred to Schechter. This letter stated:

A lawsuit has been filed in Federal Court on your behalf by the Law Offices of Pitts & Collard, LLP, in association with the Law Offices of Schechter & Associates. Our two offices will *work together* on your case, but Schechter & Associates and its staff will do *most of the day-to-day work with you* and you should report important events to them and cooperate with their staff as fully as you have to date with Pitts & Collard, LLP.... *Both our firms will share the work and share the fee in your case. ...*

(Emphasis supplied.)

 Under the Rules of Disciplinary Conduct, a client must consent in writing to a referral agreement to give it effect. *See* Tex. Disciplinary R. Prof'l Conduct 1.04(f)(2), *reprinted in* TEX. GOV'T CODE

ANN., tit. 2, subtit. G app. A (West 2005) (Tex. State Bar R. art. X, § 9). In particular, Rule 1.04(f) states:

A division or arrangement for division of a fee between lawyers who are not in the same firm may be made only if ... the client consents in writing to the terms of the arrangement prior to the time of the association or referral proposed, including ... whether fees will be divided based on the proportion of services performed or by lawyers agreeing to assume joint responsibility for the representation....

*Id.* The letter that Pitts and Melancon sent on January 31, 1994 was the mechanism by which the lawyers solicited the clients' consent, which was required to effectuate the referral and fee-sharing agreement. Therefore this letter pertains to the same transaction as the nine letter agreements, and we must consider it in determining the parties' intent and whether the contracts were ambiguous. *See De-Witt Cnty. Elec. Coop.,* 1 S.W.3d at 102. Based on the nine letter agreements and the letter that the lawyers sent to their clients, we find that their meaning is uncertain and doubtful with respect to the disputed questions of whether and to what extent the two law firms would divide professional responsibilities for the preparation of cases on behalf of their joint clients. While the letters stated that referred cases would be "handled by" Melancon, they also referenced the two firms "working" together, Pitts reserved the option to act as second-chair counsel, and the letter to clients stated that the firms would "work together" and "share the work."

Because the agreement was reasonably susceptible to more than one meaning, we hold that the nine letter agreements were ambiguous in regard to this question and that the trial court did not err by permitting the jury to consider parol evidence in

answering the breach-of-contract question. *See id.* at 100; *Coker,* 650 S.W.2d at 393–94.

### b. Sufficiency of evidence

*Agreement to share work.* As noted above, the nine letter agreements and the letter to clients soliciting their consent to the referrals contain statements suggesting an intent for the lawyers to continue working together on the clients' cases. For example, the first six letters from Pitts to Schechter stated, "We look forward to working with you on these cases." The letter to the clients said, "Both our firms will share the work and share the fee in your case."

Because the parties' agreement was ambiguous about the division of work responsibilities, the jury was entitled to consider parol evidence, such as the parties' testimony about the agreement. Schechter testified that their "deal at the time" was that they would handle the cases jointly. Regarding the client letter, Schechter testified:

To me that meant that we were going to jointly handle this mass-tort case as a project, that we were going to work on it together, that I was going to be responsible for setting up what needed to be done, Richard Melancon and Gary Pitts were going to be the lead counsel in the litigation; and then there was an understanding that if the case actually had to be litigated at some point down the line, that I would become involved in the active litigation, that as far as the project itself goes, you know, it was going to be a joint deal.

In March 1994, Pitts and Melancon (on behalf of Schechter's firm), sent a joint litigation update to their clients, on Pitts & Collard letterhead, which suggests that the parties were working together on the cases. The same month, a memoran-

dum from Pitts to Collard, Schechter, and Melancon detailed a litigation plan, which specified how the four lawyers should share the work of interviewing their clients.

Two months later, Pitts sent a memo to "Task Force Leader Schechter" about the referred implant cases. Pitts requested a change to the affidavits they were asking their clients to sign. The memo stated: "At the bottom of the affidavit we ask that you change it to: 'This will further ratify that my attorneys, Pitts & Collard, L.L.P. have associated Arthur Schechter & Associates in my case.'" In addition, Pitts stated, "We appreciate your trying to set up modem ability between our computers. This will save everyone a lot of time." Based on this and other parts of the record, we conclude that the evidence is legally sufficient to support the jury's verdict that the parties agreed to share the litigation work. *See City of Keller,* 168 S.W.3d at 827.

*Prior breach by Pitts.* Two breast-implant clients testified. One testified that based on the January 1994 letter, she expected both law firms to work together on her case, but she received no regular correspondence from Pitts or his firm. She testified that from 1994 through 2004, she had no indication that Pitts was working on her case, and she believed he had simply stopped working on it. She testified that she believed Pitts abandoned her case around 1994 or 1995, stating: "I thought they fell off the edge of the world."

Another client also testified that based on the January 1994 letter, she believed the law firms would work together to represent her. However, she testified that Pitts had done no work on her case since around the time Dow Corning filed for bankruptcy, approximately mid–1995. Regarding Pitts & Collard's involvement, she said, "[T]hey never called me after the initial visit.... They didn't do any work. They never contacted me."

■ Schechter testified that he was the only attorney handling these cases since 2002 and that Pitts stopped working with him years before that. He testified that "after 1995 basically there really wasn't any reason for me to assert much of anything to try to get their help. And after 1996, they continued to give instructions on the file but would not do anything to help or participate." Schechter paid Pitts 40% of the attorney's fees received in the referred cases until October 1997, at which time Schechter instructed his staff to set the fees due to Pitts aside in a separate account. A paralegal who worked for Schechter testified that Schechter sent at least one additional check to Pitts after 1997, but Pitts did not cash it. Schechter testified that he continued to communicate with Pitts and send him copies of client settlement statements through 1998. Even Pitts acknowledged that the letter he sent the clients in 2004 regarding Schechter's assessment of interest was his first communication with the clients in approximately eight years.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence was legally sufficient to enable reasonable jurors to conclude that Pitts agreed to share the litigation work, Pitts stopped sharing the litigation work in approximately 1996, and Schechter continued to pay Pitts under the agreement through 1997. We hold that the evidence was therefore legally sufficient to show that Pitts breached the contract first. *See City of Keller,* 168 S.W.3d at 827.

■ We also hold that the evidence was factually sufficient to support the jury's verdict as to Pitts's prior breach and that the trial court did not abuse its discretion in denying Pitts's motion for new trial.

Central to Pitts's factual-sufficiency issue are his contentions that he never agreed to share the work and that the writings between the parties did not evidence any agreement or obligation for him to share the litigation work. Pitts testified to this throughout the trial. The jury's determination about Pitts's prior breach depended heavily on its interpretation of the contract, which, in turn, depended on an evaluation of the credibility of the witnesses. Simply put, the parties disagreed about the meaning of their agreement. We may not overrule the jury's implicit credibility determinations. *Golden Eagle Archery,* 116 S.W.3d at 761. For this reason, and based on the evidence in the record, we conclude that the evidence supporting the jury's finding as to prior breach was not so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain,* 709 S.W.2d at 176.

Because we must affirm the trial court's judgment on any legal theory that is supported by the evidence and the jury's verdict, we need not consider Pitts's arguments about the legal and factual sufficiency of the evidence to support Schechter's other affirmative defenses. *See Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990).

## 2. Effect of Schechter's continuing representation of the joint clients

██ Despite legally sufficient evidence supporting the jury's verdict on Schechter's affirmative defense of prior breach, Pitts contends that Schechter waived his right to assert prior breach by electing to continue the contract. The argument is that if Schechter believed Pitts had breached the agreements first, he could have ceased performance and sued for breach of contract in 1996 or found substitute counsel. Under this theory, because Schechter chose to continue, Pitts contends that he remained obligated to share the fees he collected.[4] *See, e.g., Hanks v. GAB Bus. Servs., Inc.,* 644 S.W.2d 707, 708 (Tex.1982) ("A party who elects to treat a contract as continuing deprives himself of any excuse for ceasing performance on his own part."); *Henry v. Masson,* 333 S.W.3d 825, 840 (Tex.App.-Houston [1st Dist.] 2010, no pet.). In response, Schechter argues that his continued representation of the clients should not be given any such effect because he owed duties arising from the attorney-client relationship independent of the fee arrangement with Pitts.

Pitts wrongly assumes that Schechter treated his failure to share work as a partial breach (which, by his conduct, Schechter purportedly elected to waive) rather than a total breach of their agreement (terminating Schecter's obligation to perform and giving rise to the claim for damages). Pitts identifies no actions by Schechter that constituted a continuation of the agreement between them other than continuing to "operate" under the letter agreements and "accept the benefits of the agreements," meaning that he continued to render services to the joint clients and collect a fee. Just as a landowner exercising his independent rights over his property may move into a defective home without

**4.** Pitts also contends that Schechter receives a double-recovery windfall if he is permitted to keep the full measure of attorney's fees he collected from the breast-implant clients and also recover damages from Pitts for out-of-pocket expenses to hire extra employees to do the work that Pitts failed to perform. This argument does not directly support the issue raised by Pitts, i.e. that Schechter had a continuing contractual obligation to split the fees collected. The windfall complaint instead goes to the measure of damages awarded for Pitts's breach—a matter not contested through an issue challenging the legal or factual sufficiency of the evidence to support the amount of the award.

thereby waiving complaints against the builder who breached a construction contract, *see* E. ALLAN FARNSWORTH, CONTRACTS § 8.19, at 598 (3d ed. 1999) (citing *Cawley v. Weiner*, 236 N.Y. 357, 140 N.E. 724, 725 (1923)), we decline to hold that Schechter waived his claims against Pitts by continuing to honor his independent obligations to his clients. The Texas Disciplinary Rules of Professional Conduct do not authorize Pitts or Schechter to terminate representation of their joint clients based upon a dispute between them about division of labor or sharing of fees. *See generally* Tex. Disciplinary R. Prof'l Conduct 1.15, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (West 2005) (Tex. State Bar R. art. X, § 9). We therefore conclude that Schechter's continued representation of the joint clients did not, in and of itself, constitute an election to treat the fee-sharing agreement as a continuing contract or otherwise absolve Pitts of the consequences of his breach. We hold that the trial court did not err in rendering judgment on the jury's verdict, which found that Schechter's breach of the nine letter agreements was excused.

\* \* \*

Having found that the evidence is legally and factually sufficient to support Schechter's affirmative defense of prior breach, we hold that the trial court did not err by rendering a take-nothing judgment against Pitts on his breach of contract claim pertaining to the letter agreements.

**B. Schechter's appeal concerning existence of joint venture and duties of good faith and fair dealing**

In Schechter's appeal, he argues that the trial court erred by refusing to submit jury questions regarding the existence of a joint venture and whether, in the event a joint venture existed, Pitts breached his resulting duty of good faith and fair dealing. Schechter tendered to the court requested jury instructions on joint venture and breach of the duty of good faith and fair dealing, in substantially correct wording. The issue therefore is preserved for our review. TEX.R. CIV. P. 278; *ASEP USA, Inc. v. Cole*, 199 S.W.3d 369, 376 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

■ We review a trial court's decision to submit or refuse a particular question for an abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990); *ASEP USA*, 199 S.W.3d at 376. "The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's actions. Rather, the question is whether the trial court acted without reference to any guiding principles and law." *ASEP USA*, 199 S.W.3d at 376 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985)). A trial court must submit a jury question if it is supported by some evidence, but it may refuse to do so if it is not supported by any evidence. *See* TEX.R. CIV. P. 278 ("The court shall submit the questions ... which are raised by the written pleadings and the evidence."); *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992). If there is some evidence to support a jury question and the trial court does not submit the question, the trial court commits reversible error. *See Elbaor*, 845 S.W.2d at 243. In determining whether a trial court should have submitted a question to the jury, the reviewing court must examine the record for evidence supporting submission of the question and ignore all evidence to the contrary. *See id.* Conflicting evidence presents a fact question for the jury. *See Brown v. Goldstein*, 685 S.W.2d 640, 641–42 (Tex.1985).

A joint venture is similar to a partnership, but it is ordinarily limited to a particular transaction or enterprise. *See Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 713 (Tex.App.-Houston [1st Dist.] 1988, writ denied); *Harrington v. Harrington*, 742 S.W.2d 722, 724 (Tex.App.-Houston [1st Dist.] 1987, no writ). A joint venture must be based upon an agreement, either express or implied. *Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 287 (Tex.1978). A joint venture exists if the parties concerned have: (1) a community of interest in the venture; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control or management of the venture. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 535 (Tex.2002); *Knowles v. Wright*, 288 S.W.3d 136, 147 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). "Whether a joint venture exists is a question of law for the court's determination." *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.*, 48 S.W.3d 865, 879 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

"A joint venture does not exist if any one of the four elements is missing." *Brazosport Bank of Tex. v. Oak Park Townhouses*, 889 S.W.2d 676, 683 (Tex. App.-Houston [14th Dist.] 1994, writ denied) (citing *State v. Houston Lighting & Power Co.*, 609 S.W.2d 263, 268 (Tex.Civ. App.-Corpus Christi 1980, writ ref'd n.r.e.)). These elements cannot be established by implication. *Id.* at 683. If the parties do not agree to share losses, no joint venture will be implied. *See Coastal Plains Dev. Corp.*, 572 S.W.2d at 288. Thus, "[n]o joint venture exists as a matter of law where an agreement includes a provision for sharing profits, but no express provision for sharing losses." *Arthur v. Grimmett*, 319 S.W.3d 711, 721 (Tex.App.-El Paso 2009, pet. denied) (citing *Gutierrez v. Yancey*, 650 S.W.2d 169, 172 (Tex.App.-San Antonio 1983, no writ)); *see Brazosport Bank*, 889 S.W.2d at 683 ("Where the issue before the trial court is whether a joint venture exists, proof of an agreement to share profits does not also constitute proof of an agreement to share losses.").

On appeal, Schechter argues that there was evidence of each of the four elements of joint venture, and therefore the trial court erred by refusing to submit the requested jury instruction. Pitts argues that there is no evidence of an agreement to share the losses; he does not contest that there is some evidence on the other elements of joint venture. This issue was disputed at trial, and Schechter contends that his testimony and that of attorney Richard Laminack constitute some evidence of an agreement to share the losses involved in the breast-implant litigation.

Laminack testified that he had no personal knowledge of the usual fee-splitting arrangement employed by the parties to this lawsuit. He also testified, however, that it was common practice among plaintiffs' lawyers to share losses in mass-tort litigation. Although Laminack's testimony about what he and other lawyers do is no evidence of what Pitts and Schechter agreed to do, Schechter referred to Laminack's testimony in explaining the agreement he had with Pitts. Schechter testified, "[W]e agreed to share the profits and losses in these cases in the manner that Mr. Laminack described basically. That's what I understood was happening."

Schechter relies entirely upon parol evidence of his own interpretation of the letter agreements to demonstrate an agreement to share losses. However the letter agreements are not ambigious as to this point, and we cannot rely upon parol evidence to create an ambiguity when none exists on the face of the agreement. *See Nat'l Union Fire Ins.*, 907 S.W.2d at 520.

The letters refer to the parties' agreement to share fees on a "fees-recovered basis," and they are silent on the subject of losses. An agreement to share profit and an agreement to share losses are separate elements necessary to the creation of a joint venture. *St. Joseph Hosp.*, 94 S.W.3d at 535. Thus, the existence of a joint venture cannot be based on an inference that the parties agreed to share losses in some cases, when that inference arises only from an agreement to share fees in other cases. *See, e.g., Arthur*, 319 S.W.3d at 721 ("No joint venture exists as a matter of law where an agreement includes a provision for sharing profits, but no express provision for sharing losses."); *Brazosport Bank*, 889 S.W.2d at 683; *Gutierrez v. Yancey*, 650 S.W.2d 169, 172 (Tex. App.-San Antonio 1983, no writ) (holding that no joint venture existed as matter of law when contract explicitly provided for allocation of potential profits but made no provision for sharing of losses); *see also W.H. Hodges & Co. of Alexandria, Inc. v. Donley Cnty. State Bank of Clarendon*, 407 S.W.2d 221, 224 (Tex.1966).

Because Schechter presented no evidence demonstrating an agreement to share losses, the trial court correctly declined to submit a jury question on the existence of a joint venture. Accordingly, the instruction about the duty of good faith and fair dealing was also correctly declined, and we overrule Schechter's issue.

**C. Schechter's appeal concerning limitations as applied to contract claim**

Schechter also argues that the trial court erred by concluding that the four-year statute of limitations applied to his contract claim and by granting judgment n.o.v. barring his recovery of $85,610 in contract damages which accrued more than four years before he filed suit.

A judgment notwithstanding the verdict is proper when a directed verdict would have been proper. Tex.R. Civ. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex.1991). The motion should be granted (1) when the evidence is conclusive, and one party is entitled to recover as a matter of law or (2) when a legal principle precludes recovery. *See Spencer v. Eagle Stars Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex.1994). A motion for judgment n.o.v. based on a legal principle is appropriately granted when it is conclusively established that recovery is precluded even though all the allegations are proven. *Schindley v. Ne. Tex. Cmty. Coll.*, 13 S.W.3d 62, 65 (Tex.App.-Texarkana 2000, pet. denied); *see John Masek Corp. v. Davis*, 848 S.W.2d 170, 173 (Tex. App.-Houston [1st Dist.] 1992, writ denied). Although appellate courts ordinarily review a trial court's ruling on a motion for judgment n.o.v. under a no-evidence standard of review, *Wal–Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex.2003) (per curiam), whether a cause of action is barred by limitations is a question of law that appellate courts review de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex.2003). Because the trial court granted Pitts's motion for judgment n.o.v. based on the statute of limitations, we review this issue de novo. *See id.*

The limitations period for breach of contract claims is four years. Tex. Civ. Prac. & Rem.Code Ann. § 16.051 (West 2008); *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex.2002). "Limitations begins to run upon accrual of the cause of action." *Barker v. Eckman*, 213 S.W.3d 306, 311 (Tex.2006). A breach of contract claim accrues when the contract is breached. *Stine*, 80 S.W.3d at 592; *Ambulatory Infusion Therapy Specialist, Inc. v. N. Am. Adm'rs, Inc.*, 262 S.W.3d 107, 119 (Tex. App.-Houston [1st Dist.] 2008, no pet.). Thus, "[w]hen recovery is sought on an

obligation payable in installments, the statute of limitations runs against each installment from the time it becomes due." *Hollander v. Capon*, 853 S.W.2d 723, 726 (Tex. App.-Houston [1st Dist.] 1993, writ denied). But if the parties' agreement contemplates a continuing contract for performance, the limitations period does not usually commence until the contract is fully performed. *See, e.g., Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 355 (Tex.App.-Houston [1st Dist.] 2010, pet. denied); *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.).

█ Schechter argues that the trial court erred in applying the statute of limitations. He contends that the nine letter agreements comprised a continuing contract because the parties contemplated that Pitts would share the litigation work and because the final amount of attorney's fees could not be distributed until all losses and unrecoverable expenses had been offset from the total amount of attorney's fees.

The parties anticipated that the shared litigation work would occur over an extended period of time, but that does not convert the agreement into a continuing contract. This was not a class-action lawsuit in which all of the work had to be substantially completed before any recovery could be received. Rather, this was a mass-tort project that involved individual claims. *Cf. Authorlee v. Tuboscope Vetco Int'l, Inc.*, 274 S.W.3d 111, 121 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (explaining that mass-tort settlement involved individual negotiations on individual cases). Therefore, Schechter's cause of action for breach of contract, based on Pitts's failure to perform by sharing the litigation work, accrued at the time of Pitts's breach. *See, e.g., Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 392 (5th Cir.2004) (holding

that employment agreement was not continuing contract) (citing *Sun Med. Inc. v. Overton*, 864 S.W.2d 558, 560–61 (Tex. App.-Fort Worth 1993, writ denied)). Because we have already held that there was no evidence that the parties agreed to share losses, we reject Schechter's argument that the need to offset losses against total attorney's fees supports the conclusion that the parties had a continuing contract.

Accordingly, we conclude that Schechter's contract claims were barred by limitations to the extent they accrued more than four years before suit was filed. We hold that the trial court did not err by granting Pitts's motion for judgment n.o.v. on this issue. We overrule this issue in Schechter's appeal.

### D. Attorney's fees

█ Both parties raised issues relating to attorney's fees. Pitts argues that the trial court erred by not reducing the attorney's fees awarded to Schechter because of a partial settlement and because part of Schechter's claim was barred by the statute of limitations. Texas law does not allow for recovery of attorney's fees unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex.2006). "As a result, [attorney's] fee claimants have always been required to segregate fees between claims for which they are recoverable and claims for which they are not." *Id.* at 311. However, the party opposing an award of attorney's fees must make a timely objection. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex.1997) ("[I]f no one objects to the fact that the attorney's fees are not segregated as to specific claims, then the objection is waived."); *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex.1988). Such an objection must be made before the trial court renders judgment. *See* Tex.R.App. P. 33.1(a)(1) (provid-

ing that party must make "timely request, objection, or motion" to present complaint for appellate review); cf. Donihoo v. Lewis, No. 01–08–00277–CV, 2010 WL 1240970, at *14 (Tex.App.-Houston [1st Dist.] Mar. 25, 2010, pet. denied) (mem. op.) (holding that segregation of attorney's fees must be raised before trial court renders judgment).

At the charge conference, Pitts did not object to the failure to segregate attorney's fees or request an instruction thereon. Pitts opposed Schechter's motion to enter judgment after the jury rendered its verdict, asserting that "one-half of the attorney fees were settled by Ed Collard," but this objection did not account for the fact that none of the post-settlement fees incurred by Schechter were attributable to pursuing a claim against Collard. Pitts first raised his objection to the failure to segregate attorney's fees in his motion for new trial and in his fourth supplemental motion for judgment n.o.v. These two motions were filed nearly a full month after the trial court rendered judgment. Because Pitts's objection to the failure to segregate attorney's fees was not raised before the trial court rendered judgment, Pitts has waived this objection on appeal. See Tex.R.App. P. 33.1(a), Donihoo, 2010 WL 1240970, at *14. We overrule Pitts's issues relating to the award of attorney's fees.[5]

In his appeal, Schechter argues that the jury's award of no attorney's fees for his cause of action pertaining to the interpretation of the 1995 agreement was against the great weight and preponderance of the evidence. This is a complaint about factual sufficiency. Griffin v. Carson, No. 01–08–00340–CV, 2009 WL 1493467, at *2 (Tex.App.-Houston [1st Dist.] May 28, 2009, pet. denied) (mem. op.). A motion for new trial is a prerequisite to bringing a complaint on appeal alleging either that the evidence is factually insufficient to support a jury finding or that a jury finding is against the great weight and preponderance of the evidence. See Tex.R. Civ. P. 324(b)(2), (3). Schechter did not file a motion for new trial. Therefore, this issue is not preserved for our review. See id.; Griffin, 2009 WL 1493467, at *2. We overrule Schechter's issue.

## III. Defamation and abuse of process claims

Having resolved all the issues pertaining to the parties' contract claims, we now consider the issues pertaining to Schechter's defamation and abuse of process claims. In response to Pitts's lawsuit, Schechter countersued for defamation based on statements Pitts made to the Houston City Council and to Schechter's professional colleagues. Schechter later

5. In the sole issue addressed by Pitts's motion for rehearing, Pitts contends that the parties agreed and stipulated before trial that any recovery by Schechter, including any recovery for attorney's fees, would be reduced by half to account for Schechter's settlement with Collard. We have reviewed the record excerpts relied upon by Pitts, and it is apparent that the context of the relevant stipulation was a discussion of Pitts's motion in limine and Pitts's damages claims against Schechter. Although the parties did agree to refrain from mentioning the Collard settlement, they only discussed reducing any jury award on Pitts's claims for damages, and in particular there was no discussion about the effect on a jury award on Schechter's claims for attorney's fees. The discussion culminated with the trial court stating: "the way to resolve this is that this is a suit brought by Pitts & Collard for 100 percent and then with the agreement of everybody that at the end of the day, however much the jury awards, we cut it in half." Counsel for both Pitts and Schechter indicated their agreement on the record. The stipulation thus did not relate to the Collard settlement's effect on any claim asserted by Schechter.

added a cause of action for abuse of process based on the filing of a video recording of Pitts's remarks to city council in the underlying litigation. Although the trial court had ordered the parties to keep the recording confidential, on three separate occasions Pitts filed it without placing it under seal. On appeal we must determine whether the defamation claims were barred by limitations, whether the finding of liability on the professional colleague defamation claim was supported by sufficient evidence, and whether there was legally sufficient evidence to support the liability finding and damages awarded on Schechter's claim for abuse of process.

## A. Defamation claim based on statements to city council

Schechter raises numerous appellate issues related to his defamation claim based on statements Pitts made to the Houston City Council before it confirmed Schechter's nomination to serve as METRO Chairman. He contests the trial court's determination that his cause of action was barred by limitations and not revived by the Civil Practice and Remedies Code. He also addresses the sufficiency of the evidence to support the jury's verdict as to defamation and actual malice relating to Pitts's statements to city council. Finally, he argues that no absolute privilege applied to Pitts's statements before city council.

■■■ "A trial court may disregard a jury's verdict and render a [judgment n.o.v.] if there is no evidence to support the jury's findings or if a directed verdict would have been proper." *Williams v. Briscoe*, 137 S.W.3d 120, 124 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (citing *Brown v. Bank of Galveston*, 963 S.W.2d 511, 513 (Tex.1998)). "When a trial court specifies the ground upon which it is granting a judgment notwithstanding the verdict, an appellant need only challenge

the ground relied upon by the trial court." *Edascio, L.L.C. v. NextiraOne L.L.C.*, 264 S.W.3d 786, 795 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (citing *Voskamp v. Arnoldy*, 749 S.W.2d 113, 118 (Tex.App.-Houston [1st Dist.] 1987, writ denied)). In granting judgment n.o.v. in favor of Pitts on the city council defamation claims, the trial court expressly relied on the statute of limitations and non-revival under section 16.069 of the Civil Practice and Remedies Code. Therefore Schechter need only challenge this ground on appeal.

■■■ A defamation cause of action ordinarily accrues on the date the defamatory matter is published or circulated. *See, e.g., Newsom v. Brod*, 89 S.W.3d 732, 736 (Tex.App.-Houston [1st Dist.] 2002, no pet.). The limitations period for slander is one year after the day the cause of action accrues. TEX. CIV. PRAC. & REM.CODE § 16.002 (West 2002); *see Newsom*, 89 S.W.3d at 735–36. However, Civil Practice and Remedies Code section 16.069 provides an exception to the statute of limitations applicable to compulsory counterclaims:

> (a) If a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required.

> (b) The counterclaim or cross claim must be filed not later than the 30th day after the date on which the party's answer is required.

TEX. CIV. PRAC. & REM.CODE ANN. § 16.069 (West 2008). The statute is a savings clause, "intended to prevent a plaintiff from waiting until an adversary's valid claim arising from the same transaction was barred by limitations before asserting

his own claim." *Hobbs Trailers v. J.T. Arnett Grain Co.*, 560 S.W.2d 85, 88 (Tex. 1977) (interpreting predecessor statute substantially similar to section 16.069); *accord Leasure v. Peat, Marwick, Mitchell & Co.*, 722 S.W.2d 37, 38 (Tex.App.-Houston [1st Dist.] 1986, no writ); *Wells v. Dotson*, 261 S.W.3d 275, 280–81 (Tex.App.-Tyler 2008, no pet.). "We apply a logical relationship test to determine whether counterclaims arise out of the same transaction or occurrence." *Commint Technical Servs., Inc. v. Quickel*, 314 S.W.3d 646, 653 (Tex.App.-Houston [14th Dist.] 2010, no pet.) (citing *Jack H. Brown & Co. v. Nw. Sign Co.*, 718 S.W.2d 397, 400 (Tex.App.-Dallas 1986, writ ref'd n.r.e.)); *accord Wells*, 261 S.W.3d at 281. The logical relationship test is met when the same facts, which may or may not be disputed, are significant and logically relevant to both claims. *Commint Technical Servs.*, 314 S.W.3d at 653.

On April 2, 2002, Pitts spoke negatively about Schechter during the non-agenda portion of the Houston City Council meeting. The gist of Pitts's remarks was an expression of his opinion that Schechter's business and political affairs suggest that he is a dishonest and unethical person. Over three years later, on August 10, 2005, Schechter asserted defamation as a counterclaim to Pitts's lawsuit alleging breach of contract. Because Schechter first asserted this claim more than one year after the day that Pitts allegedly slandered Schechter at the city council meeting, Schechter's claim was barred by limitations. *See* Tex. Civ. Prac. & Rem.Code § 16.002; *Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 636 (Tex.App.-Houston [1st Dist.] 2002, no pet.). Nevertheless, Schechter argues that Pitts's statements were motivated by his disappointment about the outcome of their failed contractual and business relationship, and that the defamation action based on these allega-

tions was therefore revived by section 16.069 because it arises from the same transaction as Pitts's breach of contract claim.

As discussed above, Pitts sued for breach of contract alleging that he had referred certain personal-injury cases to Schechter. Under the referral agreements, Schechter was to share attorney's fees, and Pitts alleged that Schechter failed to pay his share from the successful claims. Schechter's defamation claim alleged that Pitts caused him harm by slandering him before the Houston City Council. Accordingly, Pitts's causes of action arise from the contract between the parties, and Schechter's causes of action arise from statements Pitts made about Schechter's fitness to serve in an appointed position. We conclude that the logical relationship test is not met here and that Schechter's defamation claims do not arise out of the same transaction or occurrence that was the basis of Pitts's contract action. *See Commint Technical Srvs.*, 314 S.W.3d at 653. Therefore, Schechter's city-council defamation claims were barred by limitations, and we hold that the trial court properly rendered a take-nothing judgment on this claim.

## B. Defamation claim based on statements to professional colleagues

Pitts challenges the trial court's judgment in Schechter's favor on the defamation claim based on statements to Schechter's professional colleagues. Pitts argues that the evidence shows that he spoke with only one of Schechter's professional colleagues, Richard Melancon, and that any claims based upon his statements to Melancon were barred by limitations. Pitts also contends that Schechter should have obtained a jury finding on actual malice and, in any event, the evidence is legally and factually insufficient to establish actual

malice. He further argues that the evidence is legally and factually insufficient to support the damages award.

### 1. Limitations

 Pitts argues that the professional colleague defamation claim is barred by limitations for the same reasons that the city council defamation claim is time-barred. Because limitations is an affirmative defense, *see* TEX.R. CIV. P. 94, Pitts had the burden to "plead, prove, and secure findings to sustain [his] plea of limitations." *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex.1988). Unlike his statements made to city council, Pitts's statements to Melancon were not known to Schechter at the time they were made, and the discovery rule applies to a defamation claim if the matter is not public knowledge. *Wheeler*, 95 S.W.3d at 636. Pitts did not seek or obtain a determination from the jury as to when the professional colleague statements were made. No issue on limitations was submitted to the jury, and Pitts did not object to this omission or request that a question on limitations be submitted. He has therefore waived his limitations defense. *See* TEX.R. CIV. P. 279; *see also Wise v. Anderson*, 163 Tex. 608, 359 S.W.2d 876, 880–81 (1962) (holding that plaintiff waived issue by failing to request jury issues and obtain fact findings on whether defendant's absence from state tolled statute of limitations); *Roberts v. Holmes*, 412 S.W.2d 947, 949 (Tex.Civ. App.-Eastland 1966, no writ) (holding that appellants waived limitations defense by failing to request jury question or object to trial court's failure to submit limitations issue).

### 2. Actual malice

In connection with the professional-colleague defamation claim, the jury found that Schechter was harmed as a result of Pitts's malice. In a question predicated upon a finding that Pitts made statements to professional colleagues of Schechter that were defamatory per se, the jury was specifically asked whether any harm resulted from malice. The jury was instructed that "malice" meant:

(a) a specific intent by Gary Pitts to cause substantial injury to Arthur L. Schechter; or

(b) an act or omission by Gary Pitts,

(i) which, viewed objectively from the standpoint of Gary Pitts at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which Gary Pitts had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

Pitts argues that Schechter was a public figure during all times relevant to the defamation claims, and therefore a jury finding of actual malice was required to support the claims. *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 726, 728–29, 11 L.Ed.2d 686 (1964); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 119–20 (Tex.2000). Pitts also argues that the evidence is legally and factually insufficient to prove actual malice by clear and convincing evidence.

#### a. Schechter's public-figure status

As a threshold matter, we must resolve the question of whether Schechter was a public figure for purposes of this claim, which he denies. Schechter contends that although he had been publicly identified as one of several possible nominees to the METRO board, there was no controversy about his nomination at the time of Pitts's defamatory statements. Moreover,

Schechter points out that city council had not yet been asked to confirm him as of the time Pitts made his presentation.

■■■■■ "The question of public-figure status is one of constitutional law for courts to decide." *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). As opposed to general-purpose public figures, "who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts," a limited-purpose public figure is only a public figure "for a limited range of issues surrounding a particular public controversy." *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974)). We apply a three-part test to determine whether Schechter qualified as a limited-purpose public figure:

(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

(2) the plaintiff must have more than a trivial or tangential role in the controversy; and

(3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Id.* Schechter easily satisfies this standard. His nomination to chair the METRO board was a matter of public concern that impacted the entire Houston area. Pitts's comments and the resulting controversy concerned Schechter's fitness to serve in that role. Accordingly, Schechter had a central role. Contrary to Schechter's suggestion, no preexisting "controversy" was required, and we therefore hold that he was a public figure for this purpose. *Cf. Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277, 91 S.Ct. 621, 628, 28 L.Ed.2d 35 (1971) ("a charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's or a candidate's fitness for office" for purposes of applying *New York Times v. Sullivan* ); *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 814 (Tex.1976).

### b. Waiver

■■■ Schechter contends that Pitts waived his complaint about the absence of an instruction on actual malice. The free-speech implications of this case require that we find waiver only in circumstances that are "clear and compelling." *Osterberg v. Peca*, 12 S.W.3d 31, 40 (Tex.2000) (quoting *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967)).

Pitts argues that the gravity of his First Amendment interests requires that our analysis consider whether the grounds for procedural waiver of the actual-malice evidentiary standard "are adequate as a matter of substantive federal constitutional law to protect the constitutional interests at stake," as required by *Osterberg v. Peca*, 12 S.W.3d 31, 39–40 (Tex.2000).[6] In stating this rule, the Texas Supreme Court

---

**6.** Our original opinion interpreted this language in *Osterberg* to require that we " 'make an independent examination of the whole record' so as to ensure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *E.g., Snyder v. Phelps*, —— U.S. ——, ——, 131 S.Ct. 1207, 1216, 179 L.Ed.2d 172 (2011); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984); *New York Times*, 376 U.S. at 285, 84 S.Ct. at 728. In light of additional briefing provided by the parties on Schechter's motion for rehearing, and for the reasons provided above, we now conclude that *Osterberg* does not require a de novo review in response to an allegation of procedural waiver of the First Amendment requirement of clear and convincing evidence of actual malice to support a public figure's defamation claim.

relied upon the authority of *Lawrence v. State Tax Comm'n,* 286 U.S. 276, 282, 52 S.Ct. 556, 558, 76 L.Ed. 1102 (1932), quoting that opinion for the proposition that "[e]ven though the claimed constitutional protection be denied on nonfederal grounds, it is the province of this Court to inquire whether the decision of the state court rests upon a fair or substantial basis." *Osterberg,* 12 S.W.3d at 40 (quoting *Lawrence,* 286 U.S. at 282, 52 S.Ct. 556, 76 L.Ed. 1102).

In *Lawrence,* the appellant was a Mississippi resident who challenged an amendment to the state's excise tax on Fourteenth Amendment equal protection grounds. *See* 286 U.S. at 279, 52 S.Ct. at 556–57. The challenged legislation exempted from the definition of gross income "[i]ncome of a domestic corporation, when earned from sources without this state." *Id.* The effect of the amendment was to place Lawrence at a competitive disadvantage as compared to his competitors operating as corporations. *See id.* at 279, 52 S.Ct. at 557. The Mississippi Supreme Court had avoided resolving the constitutional challenge by concluding that "if the amendment were valid, [Lawrence] could not complain," and "if invalid, he would still be subject to the tax, since the act which it amended ... would then remain in full force, and under it individuals and domestic corporations are taxed alike." *Id.* at 281, 52 S.Ct. at 558. It was in this context that the United States Supreme Court held, as quoted by the Texas Supreme Court in *Osterberg,* that "[e]ven though the claimed constitutional protection be denied on nonfederal grounds, it is the province of this Court to inquire whether the decision of the state court rests upon a fair or substantial basis." *Id.* The U.S. Supreme Court concluded in *Lawrence* that "the purported nonfederal ground put forward by the state court for its refusal to decide the constitutional

question was unsubstantial and illusory." *Id.* at 282–83, 52 S.Ct. at 558. Accordingly, the Court addressed the constitutional challenge to the statute.

In contrast to the circumstances in *Lawrence,* Pitts's procedural waiver in this case was neither unsubstantial nor illusory. Pitts filed his original answer in response to Schechter's defamation claim, and he subsequently filed three amended answers. The appellate record reflects no pretrial motions suggesting an absence of proof of actual malice to support a defamation claim. *See, e.g.,* Tex.R. Civ. P. 166a(i). The case was tried to a jury over the course of three weeks. Although Schechter moved for a directed verdict on Pitts's liability for defamation, the record reflects no written response, and Pitts offered no motion of his own suggesting a lack of evidence of actual malice. The trial court noted on the record that after the close of evidence at noon the prior day, the parties worked on the charge until around 8:00 p.m. and "hammered out all of the issues." When offered the opportunity to formally object to the charge, Pitts made several objections relating to the charge regarding his claims against Schechter, but he did not object to the malice instruction on Schechter's defamation claim. Pitts did not request that the jury be instructed on actual malice, offer a substantially correct question, or in any other way indicate that he thought the charge was improper because Schechter was a public figure. *See* Tex.R. Civ. P. 278 ("Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment....").

When "the ultimate effect of sustaining a claim of waiver might be an

imposition on" the freedom of speech, we cannot find waiver except under "clear and compelling" circumstances. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967). However, under these circumstances, we find that Pitts's failure to object or otherwise suggest the correct law to the trial court was a sufficiently clear and compelling waiver, under the ordinary procedural rules, to require the sufficiency of the evidence to be evaluated in light of the court's charge as opposed to some other law that was not identified to the trial court. *See Osterberg*, 12 S.W.3d at 55; *see also* Tex.R. Civ. P. 272 & 274; Tex.R.App. P. 33.1(a). Even when fundamental constitutional rights are at stake, the rules of appellate procedure bar review of unpreserved error except in very narrow circumstances. *See, e.g., In re B.L.D.*, 113 S.W.3d 340, 352 (Tex.2003) (applying analytical framework of *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), to conclude that due process does not require appellate review of unpreserved complaints in cases involving the termination of parental rights). The Texas Supreme Court has confirmed that the error-preservation rules vindicate the State's "strong interest in ensuring that our trial courts have an opportunity to correct errors as a matter of judicial economy." *Id.* at 353; *see also Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex.1982) (per curiam) ("The reason for the requirement that a litigant preserve a trial predicate for complaint on appeal is that one should not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time."). In the absence of any procedural due process arguments suggesting a different result in this case, "we presume that our rules governing preservation of error in civil cases comport with due process." *B.L.D.*, 113 S.W.3d at 352.

We conclude that by failing to raise the issue in the trial court, Pitts has waived his complaint about the absence of clear and convincing evidence of actual malice to support a defamation claim. We therefore overrule Pitts's issue complaining about the lack of such evidence.

### c. Actual damages

The jury awarded Schechter $100,000 for damage to his reputation and $1,000 in pecuniary damages. Pitts contends that the damages award is arbitrary and not supported by legally or factually sufficient evidence. He argues that Schechter suffered no reputational damages because he repeated his defamatory statements to only one person, Melancon. He thus contends that any presumption of reputational damages was rebutted by evidence that Melancon already had a low opinion of Schechter. In support of this argument, Pitts relies on his answer to an interrogatory, which asked him to identify each person with whom he communicated his concerns about Schechter becoming Chairman of METRO and the date and substance of each communication. He also relies on the parties' stipulation that Collard would not be called to testify. Pitts states in his brief, "No one else was alleged to have heard or been told of the statements."

The evidence does not support the contention that Melancon was only hearer of Pitts's allegedly defamatory statements. Pitts did not state in his interrogatory responses that his communications with Schechter's colleagues were limited to Melancon. Rather, he listed numerous other people in addition to Melancon, including but not limited to five other attorneys who had previously been associated with Schechter. He also disclosed that he com-

municated to the members of Houston City Council, anyone watching the Houston city government cable channel at the time of his comments to Council, and co-workers his office. Pitts stated that he repeated the substance of his city council comments only to his wife, Collard, and Melancon, but he also stated that he discussed Schechter's potential METRO appointment and possible future political ambitions with most of the other individuals identified in the interrogatory response.

Moreover, Schechter's testimony about his professional colleague claim was not limited to statements that Pitts made to Melancon. Rather, Schechter testified without objection that his professional colleague claim related to his colleagues at METRO.

Q. Generally, if you would, tell the ladies and gentlemen of the jury what your defamation claim based on the professional colleagues is.

A. Well, professional colleagues first in the sense of the METRO group. As I said, I got a phone call from the president of METRO ... with whom I was going to be working if I got this appointment and who was a very dynamic leader. She wanted to know what was going on. I went to the METRO offices to discuss it with several of the people with whom I was going to be working if the appointment went through.

And this was a volunteer public-service job. It paid nothing. It took hours and hours of time. And it was something I wanted to do because I believe in public service. I do.

And it caused me to start off in the job with a negative, which is a very bad thing for a new chairman to have going for him or her when they go into a public-service position like this.

Finally, the question that was submitted to the jury, without objection, on Schechter's professional colleague defamation claim was not limited to Melancon. Rather, the question asked only, "Were the statements that Gary Pitts made to professional colleagues of Arthur L. Schechter defamatory per se?" The jury was not provided a definition of "professional colleagues." Thus, in considering Pitts's objection to the sufficiency of the evidence to support damages, we are not limited to considering defamatory statements made to Melancon. With this background in mind, we will consider first the necessity for proof of damages in this case and whether any presumption of damages has been rebutted.

A statement is defamatory per se if it injures a person in his office, business, profession, or occupation, or if it is a false statement that accuses him of committing a crime. *See Morrill v. Cisek*, 226 S.W.3d 545, 549–50 (Tex.App.-Houston [1st Dist.] 2006, no pet.). "Our law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish." *Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex.2002) (*Bentley I*) (citing *Leyendecker & Assoc. v. Wechter*, 683 S.W.2d 369, 374 (Tex.1984)). "Once injury to reputation is established, a person defamed may recover general damages without proof of other injury." *Leyendecker*, 683 S.W.2d at 374. "Non-economic damages like these cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment." *Bentley I*, 94 S.W.3d at 605. "The amount of damages in a defamation case is peculiarly within the province of the fact-finder, and an appellate court will not disturb the verdict or award unless it appears from the record to be excessive or the result of passion, prej-

udice, or other improper influences." *Morrill,* 226 S.W.3d at 550.

 An appellate court may review a jury's award of damages in a defamation case for evidentiary sufficiency. *See Bunton v. Bentley,* 153 S.W.3d 50, 53 (Tex. 2004) (*Bentley II*) (holding that legally sufficient evidence supported remitted award of $150,000 for mental anguish); *see also Morrill,* 226 S.W.3d at 550–51 (reviewing evidence of damage to reputation for legal sufficiency); *Beaumont v. Basham,* 205 S.W.3d 608, 620–21 (Tex.App.-Waco 2006, pet. denied) (reviewing legal sufficiency of jury's award for damage to reputation). Thus, here we must determine whether the evidence would enable reasonable and fair-minded people to award Schechter $100,000 for damage to his reputation and $1,000 in pecuniary damages, *see City of Keller,* 168 S.W.3d at 827 (legal sufficiency), or if the evidence that supports these awards of damages is so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain,* 709 S.W.2d at 176 (factual sufficiency).

 The evidence in this case showed that Schechter was an attorney, a former ambassador, a philanthropist, and a government official. The evidence also established that Pitts defamed Schechter by saying, among other things not republished in this opinion, that he was dishonest and unethical in the conduct of his business and political affairs. Schechter also testified to the falsity of the statements that Pitts made. Because these statements related to Schechter's profession, they were defamatory per se, and Schechter was entitled to general damages without further proof of injury, so long as the amount of damages awarded is not excessive or the result of passion, prejudice, or other improper influences. *See Leyendecker,* 683 S.W.2d at 374; *Morrill,* 226 S.W.3d at 550. Nothing in the record

suggests that the jury's award was excessive or the result of passion, prejudice, or other improper influences. Therefore, this Court may not disturb the jury's damages award on appeal. *See Morrill,* 226 S.W.3d at 550

Although Pitts contends that Melancon's opinion of Schechter was so low that it could not have been injured further by anything Pitts may have said, we have explained that this cause of action was not limited to statements made only to Melancon.

We hold that there was legally and factually sufficient evidence to support the jury's award of non-economic damages in the amount of $100,000. However, Schechter does not identify any evidence that supports the award of $1,000 in pecuniary damages, and we find nothing in the record to support it. We therefore sustain Pitts's issue as to the pecuniary damages award and overrule his issue as to the non-economic damages award.

### d. Exemplary damages

 In addition to the $101,000 that the jury awarded in pecuniary and non-economic damages on the professional colleague defamation claim, the jury also awarded $300,000 in exemplary damages, which the trial court reduced to $200,000 in accordance with Texas Civil Practice and Remedies Code section 41.008. Pitts contends that there is no evidence to support this award of exemplary damages because there is no evidence of malice under Chapter 41 of the Texas Civil Practice and Remedies Code, which defines malice as "a specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM.CODE. ANN. § 41.001(8) (West 2008).

Exemplary damages only could have been awarded in this case if Schechter

proved by clear and convincing evidence that the harm resulting from Pitts's defamatory statements to his professional colleagues resulted from malice. *See id.* § 41.003(a)(2). We must "address the evidence or lack of evidence with specificity, as it relates to the liability for or amount of exemplary damages, in light of the requirements of [Chapter 41]." *See id.* § 41.013.

Pitts argues that there is no evidence of malice because his statements consisted only of isolated conversations between himself and his long-time friend, Melancon. But neither the evidence at trial nor the charge to the jury on this issue was limited only to communications between Pitts and Melancon. In response to Schechter's discovery requests, Pitts stated that he had, in fact, made derogatory statements about Schechter to several of Schechter's professional colleagues, including leveling specific allegations that accused Schechter of dishonest, unethical, and illegal behavior. Schechter offered detailed testimony refuting the truthfulness of each specific allegation Pitts made, and by its verdict, the jury indicated that it believed Schechter. He further testified that the defamation caused him to "start off in the [METRO] job with a negative, which is a very bad thing for a new chairman to have going for him or her when they go into a public-service position like this."

The evidence also showed that Pitts and Schechter were themselves engaged in a business dispute over multi-million dollar mass litigation at the time of the defamatory statements and that Schechter had recently won an award in mediation against Pitts. As evidenced by his statement, Pitts, who was not a Houston resident, attended a Houston city council meeting with the intent to prevent Schechter's appointment to METRO. This alone would be injurious to Schechter, but Pitts's after-the-fact repetition of defamatory statements to Schechter's colleagues had no purpose other than to injure Schechter's reputation or further his cause of blocking Schechter's appointment to METRO, both of which represent a substantial injury to Schechter.

We conclude that the evidence shows that Pitts's repetition of false and defamatory accusations about Schechter's business conduct showed a specific intent to injure Schechter, and we hold that the evidence was legally and factually sufficient to support an award of exemplary damages under Chapter 41. We overrule Pitts's issue contending that there is insufficient evidence of malice.

▇▇▇ Finally, Pitts argues that, as a matter of federal constitutional law, the ratio of exemplary damages awarded as compared to compensatory damages must be reduced from 2:1 to a ratio of 1:1. Pitts relies on *Exxon Shipping Company v. Baker,* 554 U.S. 471, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), for the proposition that when compensatory damages are "substantial," exemplary damages may not exceed compensatory damages as a matter of constitutional law. However, the Supreme Court noted that its *Exxon Shipping* decision was based on maritime law, not due process concerns. *See Exxon Shipping,* 554 U.S. at 501–02, 128 S.Ct. at 2626. The Constitution has not been applied to impose a maximum 1:1 ratio of exemplary to compensatory damages. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418, 123 S.Ct. 1513, 1513, 155 L.Ed.2d 585 (2003); *Bennett v. Reynolds,* 315 S.W.3d 867, 874 (Tex. 2010).

We overrule Pitts's objections to the trial court's judgment in Schechter's favor on the defamation claim based on statements to Schechter's professional colleagues.

## C. Abuse of process

 Schechter alleged that Pitts also committed the tort of abuse of process by repeatedly filing copies of a video recording of the statements to Houston City Council that were the subject of the defamation claim. The record reflects that Pitts took the position during pretrial discovery that he did not have a copy of the recording and that he was unable to obtain one from any public source. He insisted that a copy be produced to him by Schechter, who complied, designating it as being confidential for purposes of the protective order governing the case. The record does not reflect any objection by Pitts to this designation of confidentiality.

The protective order specified that "confidential information shall not be filed with the clerk of the Court nor included in whole or in part in pleading, motions or briefs." The order did permit the filing of confidential materials under seal "should the Court need to examine them as evidence in a hearing or other pretrial proceeding." The order further provided that confidential information "shall not be disclosed directly or indirectly to any person, including the media, other than those authorized by this Protective Order without the consent of the non-disclosing Party, or upon further order of the Court."

On appeal, Pitts has not contended that his actions were not violations of the protective order. To the contrary, Pitts affirmatively testified that the video recording was subject to a protective order, that he filed it without placing it under seal, and that, in so doing, he failed to follow the proper procedure. On cross-examination he agreed he was responsible for the recording being filed on three separate occasions without being placed under seal. Schechter's counsel testified that he complained to Pitts in writing about each of the first two violations, but Pitts neverthe-less continued to attach the videorecording to his public filings.

Although Schechter suggested to the jury that Pitts's actions resulted in confidential information being published in a newspaper article, no evidence was presented at trial to show that any information published by the newspaper could be directly traced to Pitts's violations of the protective order. The only actual damages requested by Schechter were litigation costs in the amount of $10,146.50 incurred in attempts to secure Pitts's compliance with the protective order and to remediate or reverse the effects of the violations. Schechter also sought and obtained a jury finding by clear and convincing evidence that the abuse of process damages resulted from Pitts's malice.

The jury found Pitts liable to Schechter on his claim of abuse of process and awarded $10,146.50 in actual damages and $15,000 in exemplary damages. On appeal, Pitts argues that the evidence was legally and factually insufficient to support an abuse-of-process cause of action because this claim was improperly based on litigation conduct. In addition, he contends that the judgment must be reversed because there is no evidence of special damages.

 The elements of the cause of action for abuse of process include: (1) the defendant made an illegal, improper, perverted use of the process; (2) in so doing the defendant had an ulterior motive or purpose; and (3) damage resulted to the plaintiff from the irregularity. *Detenbeck v. Koester*, 886 S.W.2d 477, 480 (Tex.App.-Houston [1st Dist.] 1994, writ dism'd). To recover for abuse of process in Texas, a claimant must demonstrate that he suffered special damages, i.e. some physical interference with the claimant's person or

property in the form of an arrest, attachment, injunction, or sequestration. *See Martin v. Trevino,* 578 S.W.2d 763, 766–769 (Tex.Civ.App.-Corpus Christi 1978, writ ref'd n.r.e.); *see also Tex. Beef Cattle Co. v. Green,* 921 S.W.2d 203, 209 (Tex. 1996). The policy supporting this rule is that it "assures good faith litigants access to the judicial system without fear of intimidation by a countersuit." *Tex. Beef Cattle,* 921 S.W.2d at 209 (quoting *Martin,* 578 S.W.2d at 768). The special damage requirement also serves to avoid needless and vexatious litigation. *See id.*

Schechter claimed no damages for abuse of process other than his legal fees incurred in the course of responding to Pitts's improper filings in violation of the protective order. But for purposes of the special-injury requirement, "[i]t is insufficient that a party has suffered the ordinary losses incident to defending a civil suit, such as inconvenience, embarrassment, discovery costs, and attorney's fees." *Id.* at 208. Schechter's appellate brief identifies no other evidence of special injury. Accordingly, we sustain Pitts's issues challenging the awards of damages, including punitive damages, on Schechter's abuse-of-process claim.

## IV. Conclusion

We affirm the judgment of the trial court in all respects concerning Schechter's contract claims against Pitts. We also affirm the judgment with respect to non-economic and exemplary damages awarded under Schechter's defamation claim. We reverse for evidentiary insufficiency that portion of the judgment that awarded Schechter $1,000 in economic damages on his professional colleague claim, and we render judgment that Schechter take nothing in economic damages on that cause of action. We also find the evidence of special injury arising from Schechter's claim

of abuse of process to be legally insufficient. We therefore reverse and render judgment that Schechter take nothing on his abuse-of-process claim against Pitts. The judgment of the trial court is affirmed in all other respects.